# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | | |
|---|---|---|
| RICHARD & NANCY BIGI, | ) | |
| | ) | |
| *Plaintiffs*, | ) | **CIVIL ACTION** |
| | ) | **NO. _____** |
| v. | ) | |
| | ) | **ORIGINAL CLASS** |
| GREENE & COOPER, LLP, KYLE A. | ) | **ACTION COMPLAINT** |
| COOPER, ENCORE CAPITAL GROUP, | ) | |
| INC., MIDLAND FUNDING, LLC, and | ) | |
| MIDLAND CREDIT MANAGEMENT, | ) | |
| INC., | ) | |
| | ) | |
| *Defendants*. | ) | Jury Trial Demanded |
| _____ | ) | |

## NATURE OF ACTION

1. This is a class action brought under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. Plaintiffs hereby incorporate their Certificate of Interested Parties, attached hereto, pursuant to S.D. Ga. LR 3.2.

## JURISDICTION AND VENUE

2. This Court has jurisdiction under 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331.

1

3.      Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b), where acts and transactions giving rise to Plaintiffs' action occurred in this State and this District, where Plaintiffs reside in this State and this District, and where Defendants transact business in this State and this District.

## PARTIES

4.      Plaintiffs Nancy and Richard Bigi ("Plaintiffs") are natural persons who at all relevant times resided in the State of Georgia, County of Chatham.

5.      Plaintiff is obligated, or allegedly obligated, to pay a debt owed or due, or asserted to be owed or due, Midland Funding LLC – and once owed or due, or asserted to be owed or due, HSBC Bank Nevada, N.A.

6.      Plaintiff's obligation, or alleged obligation, owed or due, or asserted to be owed or due Midland Funding LLC, arises from a transaction or transactions in which the money, property, insurance, goods and/or services that are the subject of the transaction(s) were incurred primarily for personal, family, or household purposes (i.e groceries and gasoline).

7.      Plaintiffs are "consumers" as defined by 15 U.S.C. § 1692a(3).

8.      Defendant Greene & Cooper, LLP ("Greene"), is a foreign for-profit professional limited liability partnership, with its principal office located at 2210

2

Greene Way, Louisville, KY, 40220, and with offices of a general partner situated at 615 Colonial Park Dr., Roswell, GA 30075.    Greene may be served by and through its registered agent: Kyle A. Cooper, 615 Colonial Park Dr., Roswell, GA 30075.

9.      Greene is a company who at all relevant times was engaged, by use of the mails and telephone, in the business of attempting to collect a "debt" from Plaintiff, as defined by 15 U.S.C. § 1692a(5).

10.     Greene uses instrumentalities of interstate commerce or the mails in a business the principal purpose of which is the collection of any debts, and/or regularly collects or attempts to collect, directly or indirectly, debts owed or due, or asserted to be owed or due another.

11.     Greene is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

12.     Defendant, Kyle A. Cooper ("Cooper"), is an individual who at all relevant times was engaged in the business of attempting to collect a "debt" from Plaintiff, as defined by 15 U.S.C. §1692a(5).

13.     Cooper, at all relevant times, was personally involved in the collection of the debt at issue.

14.    Cooper, at all relevant times, materially participated in Greene's debt collection activities – through direct management of Greene, by occupying positions of critical importance to Greene, or otherwise.

15.    Cooper, at all relevant times, exercised control over the affairs of Greene.

16.    Cooper, at all relevant times, played a significant role in designing and implementing Greene's debt collection policies and procedures.

17.    Cooper is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

18.    Defendant, Encore Capital Group, Inc. ("Encore") is a publicly-traded, for-profit Delaware corporation with principal executive offices situated at 8875 Aero Drive, Suite 200, San Diego, California.

19.    Encore's common-stock is registered pursuant to Section 12(b) of the Securities and Exchange Act of 1934 and is listed on the NASDAQ Global Select Market under the symbol "ECPG."

20.    Encore, at all relevant times, was engaged in the business of attempting to collect a "debt" from Plaintiff, as defined by 15 U.S.C. §1692a(5).

21.    Encore is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

22.     Defendant, Midland Funding, LLC ("Midland Funding"), is a for-profit Delaware company, with its principal place of business situated at  8875 Aero Dr., Ste. 200, San Diego, California, 92123.  Midland Funding may be served by and through its registered agent:  Corporation Service Company, 40 Technology Parkway South #300, Norcross, GA 30092.

23.     Midland Funding is a wholly owned subsidiary of Encore.

24.     Midland Funding is in the business of taking title to and collecting delinquent debts originally owed to third parties.

25.     Midland Funding, at all relevant times, was engaged, by use of the mails and telephone, in the business of attempting to collect a "debt" from Plaintiff, as defined by 15 U.S.C. §1692a(5).

26.     Midland Funding is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

27.     Defendant, Midland Credit Management, Inc. ("Midland Credit Management"), is a for-profit Kansas corporation with its principal place of business situated at 8875 Aero Drive, Suite 200, San Diego, California, 92123. Midland Credit Management may be served by and through its registered agent:

5

Corporation Service Company, 40 Technology Parkway South #300, Norcross, GA 30092.

28.     Midland Credit Management is a wholly owned subsidiary of Encore.

29.     Midland Credit Management, at all relevant times, was engaged in the business of attempting to collect a "debt" from Plaintiff, as defined by 15 U.S.C. §1692a(5).

30.     Midland Credit Management is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

31.     Greene, Cooper, Encore, Midland Funding, and Midland Credit Management acted jointly and in concert to collect a debt from Plaintiffs, and generally act jointly and in concert to collect consumer debts incurred primarily for personal, family or household purposes.

## FACTUAL ALLEGATIONS

### Encore – A Debt Buyer

32.     Encore purchases deeply discounted charged-off consumer receivable portfolios from national financial institutions, major retail credit corporations, telecom companies and resellers of such portfolios, and  manages their collection through its subsidiary entities.

33.     From its inception through June 30, 2009, Encore invested approximately $1.3 billion to acquire 27 million consumer accounts with a face value of approximately $43 billion.

34.     During the three months ending September 30, 2010, Encore purchased receivable portfolios with a face value of $2.6 billion for $77.9 million, or a purchase cost of 3.0% of face value.  Encore's estimated future collections at acquisition for these portfolios amounted to $166.2 million.

35.     Encore raises capital to acquire portfolios of accounts at deep discounts from their face value using a sophisticated valuation process that is based on the attributes of the underlying accounts.

36.     Encore enters into Credit Agreements with third party financial lending institutions such as JPMorgan Chase Bank, N.A., Bank of America, N.A., Morgan Stanley Bank, N.A., and Citibank, N.A., pursuant to which revolving loans are made to Encore from time to time.

37.     Once a receivable portfolio has been identified for potential purchase, Encore prepares quantitative analyses based on extracting customer level data from external sources, other than the issuer, to analyze the potential collectibility of the

portfolio. Encore also analyzes the portfolio by comparing it to similar portfolios previously acquired and serviced by Encore and its subsidiaries.

38. Members of Encore's senior management, including key officers, materially control and participate in the acquisition and collection of portfolios of charged-off consumer receivables.

39. Members of Encore's management perform qualitative analyses of other matters affecting the value of portfolios, including a review of the delinquency, charge off, placement and recovery policies of the originator as well as the collection authority granted by the originator to any third party collection agencies, and, if possible, by reviewing their recovery efforts on the particular portfolio.

40. After these evaluations are completed, Encore's Investment Committee, comprised of various members of our senior management, discusses the findings, and decides whether to purchase and finalizes the price at which to purchase the portfolio.

41. Title to the purchased portfolios is taken and held by Encore's indirect subsidiaries such as MRC Receivables Corporation, NCC-2 Corp., or Midland Funding – debt owning companies within the Encore family.

**Encore – A Debt Collector**

42.     Encore employs a "dynamic collections approach" under which it re-analyzes all of its accounts once each quarter with refreshed external data, which it supplements with information gleaned from its own collection efforts.  Encore modifies its collection method for each account, if warranted.

43.     Encore's proprietary consumer level collectability analysis is the primary determinant of whether an account is actively worked post-purchase. Throughout Encore's ownership period, it continuously refines this analysis to determine the most effective collection strategy to pursue for each account.  These strategies consist of:

- Outbound calling, driven by proprietary predictive software, by our own collection workforce located at our three domestic call centers and an international call center, through a majority-owned joint venture, in India;
- Use of a nationwide network of collection attorneys to pursue legal action where appropriate;
- Use of multiple third party collection agencies;
- Direct mail campaigns coordinated by in-house marketing group;
- Transfer of accounts to a credit card provider, generating a payment; and
- Sale of accounts where appropriate.

44.   Once receivables are ready to be worked, members of the Information Technology Department work directly with the head of Operations to discuss the specifics of the recent acquisition.  These discussions are useful because they allow the Information Technology Department to tailor Encore's proprietary account management system to reflect any special characteristics of the portfolio and Encore's collection strategy.

45.   Pursuant to a Servicing Agreement for which Encore companies are party to, Midland Credit Management – a "servicer" company – is responsible for managing and servicing the collection of the debts owned by Encore's debt owning entities such as MRC, NCC-2 Corp., or Midland Funding.

46.   The Servicing Agreement grants Midland Credit Management significant power and authority to conduct and manage the collection of the accounts to which MRC, NCC-2 Corp., or Midland Funding hold title, including, without limitation, the commencement of legal proceedings in Midland Funding's name to collect accounts.

**Encore – An Outsource Debt Collector**

47.     Encore's outsourced legal collections channel is comprised of more than 75 vendor relationships, delivers over $250 million in annual collections, and is supported by approximately 50 team members.

48.     Pursuant to certain written Collection Agreements between Midland Credit Management and various law firms, Encore generally outsources the collection of accounts where it appears the debtor is able, but is unwilling to pay. The process is managed by Encore's Legal Outsourcing Department.

49.     Pursuant to the Collection Agreements, Encore places accounts with firms such as Greene.

50.     The Collection Agreements control the manner in which firms such as Greene must conduct collection activities on behalf of Midland Credit Management in connection with the accounts owned by MRC, NCC-2 Corp., or Midland Funding.

51.     The Collection Agreements require firms such as Greene to abide by, and conduct all of their activities in a manner consistent with the then current "Procedures," which the Collection Agreements define as "the Midland Account

Handling Procedures" – modified by Midland Credit Management from time-to-time in its sole and absolute discretion.

52.     The Collection Agreements contain bilateral indemnification provisions that allocate financial liability arising out of the collection efforts of firms such as Greene.

53.     The Collection Agreements provide for Midland Credit Management's exercise of material control over each aspect of the collection efforts of firms such as Greene.

54.     The Collection Agreements confer upon Midland Credit Management the right to conduct audits without notice at the expense of firms such as Greene.

55.     The Collection Agreements require firms such as Greene to obtain and provide proof of insurance policies to Midland Credit Management.

56.     The Collection Agreements require firms such as Greene to name Midland Credit Management as loss payee in such policies.

57.     The Collection Agreements contain stringent daily reporting requirements pursuant to which firms such as Greene must make daily reports consisting of all information regarding any activity that occurs during that workday

on any account placed with the firms, including but not limited to, communications or attempted communications between the firms and consumers and/or others.

58.     The Collection Agreements mandate that firms such as Greene utilize Midland Credit Management's Daily Invoicing Report, as part of its confirmation process relating to the successful upload of activity and payments, to confirm that those amounts the firms believe were transmitted to Midland Credit Management were received by Midland Credit Management as part of each daily upload.

59.     The Collection Agreements direct that firms such as Greene must maintain or acquire technology and resources sufficient to communicate and transmit and receive data with Midland Credit Management in connection with the accounts placed with the firms.

60.     Midland Credit Management issues user IDs and passwords to firms such as Greene for the purpose of providing access to Midland Credit Management's website and computer collections software and its information databases.

61.     The Collection Agreements require firms such as Greene to maintain true, complete and accurate records, instruments, agreements, correspondence and other documentation, irrespective of the medium held, received or generated for a

period of seven (7) years on all matters and activities: (i) related to or arising in connection with each account; and (ii) arising out of or relating to the Collection Agreements.

62.     Midland Credit Management has created a "Legal Outsourcing Firm Training Manual," which it provides to firms such as Greene – which collect debts pursuant to the Collection Agreements.

63.     Encore manages and exercises control over each aspect of the collection process including legal outsourcing.

64.     Encore's management is responsible for setting the strategic direction, managing all legal outsourcing operations and personnel, driving process improvements, managing the P&L, and ensuring that Encore's suppliers/vendors are competitive.

65.     Encore's Head of Legal Outsourcing oversees all Legal Outsourcing teams across the company, providing essential leadership and staff development consistent with overall company objectives and goals.

66.     Through Midland Credit Management, Encore advances to firms such as Greene certain out-of-pocket court costs such as filing fees.   Encore capitalizes these costs in its consolidated financial statements.

67.    Encore pays a fee to firms such as Greene based on an established fee schedule, as further defined in the Collection Agreements executed by the firms and Midland Credit Management on Encore's behalf.

**Greene and Cooper – Debt Collectors On Behalf of Encore.**

68.    On or about January 12, 2011, Defendants Greene and Cooper printed and mailed, or caused to be printed and mailed, itself and on behalf of Defendant Midland Funding, a letter to Plaintiff in an effort to collect from Plaintiffs an obligation, or alleged obligation, owed or due, or asserted to be owed or due a creditor other than Defendants.  A true and correct copy of the January 12, 2011, letter is attached hereto as Exhibit "A" (The "Letter").  The Letter stated, in relevant part(s), as follows:

1.  Unless you notify us within thirty days after receipt of this notice that you dispute the validity of the debt, or any portion thereof, the debt will be assumed to be valid by us.

2.  If you notify us within the thirty-day period that the debt, or any portion thereof, is disputed, we will obtain verification of the debt or a copy of a judgment against you and a copy of such verification or judgment will be mailed to you by us.

3.  Additionally, within the thirty-day period, we will provide you with the name and address of the original creditor, if different from the current creditor.

.    69.    The Letter represents Defendants' initial written communication to Plaintiffs.

15

70.     The above statement failed to notify Plaintiffs that in order for Plaintiffs to require Defendants to obtain verification of the debt and mail such verification to Plaintiffs, Plaintiffs' dispute of the debt, or portion thereof, would need to be in writing, and therefore Defendants failed to meaningfully convey the disclosure required pursuant to 15 U.S.C. § 1692g(a)(4).

71.     The above statement further failed to notify Plaintiffs that a request for the name and address of the original creditor would have to be made in writing, and therefore Defendants failed to meaningfully convey the disclosure required pursuant to 15 U.S.C. § 1692g(a)(5).

72.     Defendants, as a matter of pattern and practice, themselves and on behalf of Midland Funding, send written correspondence to alleged consumer debtors using language substantially similar or materially identical to that utilized by Greene in its January 12, 2011 Letter to Plaintiffs.

73.     Defendants, themselves and on behalf of Midland Funding, as a matter of pattern and practice, mail or send, or cause to mailed or sent, communications to alleged debtors using language substantially similar or materially identical to that utilized by Greene in mailing, or causing to be mailed, the Letter to Plaintiff, and as a matter of pattern and practice fail to provide the

disclosures required by 15 U.S.C. § 1692g(a)(4) – (5), within five (5) days thereafter.

74.     The Letter is a standardized form letter which, upon information and belief, was sent over the course of the past year by Defendants to at least 200 Georgians.

## CLASS ACTION ALLEGATIONS

75.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 74.

76.     Plaintiffs bring this action on behalf of themselves and all others similarly situated.  Specifically, Plaintiffs seek to represent a class of individuals defined as:

> All persons located in the State of Georgia who, within one year before the date of this complaint received a letter from Defendants in connection with an attempt to collect any consumer debt, where the letter was substantially similar or materially identical to the letter delivered to Plaintiffs.

77.     The proposed class specifically excludes the United States of America, the states of the Eleventh Circuit, counsel for the parties, the presiding United States District Court Judge, the Judges of the United States Court of

Appeals for the Eleventh Circuit and the Justices of the United States Supreme Court, all officers and agents of Defendants and all persons related to within the third degree of consanguinity or affection to any of the foregoing individuals.

78.  The class is averred to be so numerous that joinder of members is impracticable.

79.  The exact number of class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery.

80.  The class is ascertainable in that the names and addresses of all class members can be identified in business records maintained by Defendants.

81.  There exists a well-defined community of interest in the questions of law and fact involved that affect the parties to be represented.  These common questions of law and fact predominate over questions that may affect individual class members.  Such issues include, but are not limited to: (a) The existence of Defendants' identical conduct particular to the matters at issue; (b) Defendants' violations of 15 U.S.C. §1692 *et seq*.; (c) The availability of statutory penalties; and (d) Attorney's fees and costs.

82.  The claims of Plaintiffs are typical of those of the classes they seek to represent.

83.     The claims of Plaintiffs and of the class originate from the same conduct, practice, and procedure, on the part of Defendants.  Thus, if brought and prosecuted individually, the claims of each class member would require proof of the same material and substantive facts.

84.     Plaintiffs possess the same interests and have suffered the same injuries as each class member.  Plaintiffs assert identical claims and seek identical relief on behalf of the unnamed class members.

85.     Plaintiffs will fairly and adequately protect the interests of the class and have no interest adverse to or which directly and irrevocably conflicts with the interests of other members of the class.

86.     Plaintiffs are willing and prepared to serve this Court and proposed class.

87.     The interests of Plaintiffs are co-extensive with and not antagonistic to those of the absent class members.

88.     Plaintiffs have retained the services of counsel who are experienced in consumer protection claims, as well as complex class action litigation, will adequately prosecute this action, and will assert, protect and otherwise represent Plaintiffs and all absent class members.

89.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) and 23(b)(1)(B).  The prosecution of separate actions by individual members of the class would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

90.     The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for the parties opposing the class.  Such incompatible standards of conduct and varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow the existence of inconsistent and incompatible rights within the class.

91.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) in that Defendants have acted or refused to act on grounds generally applicable to the class, making final declaratory or injunctive relief appropriate.

92.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) in that the questions of law and fact that are common to members of the class predominate over any questions affecting only individual members.

93.     Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint in that: (a) individual claims by the class members will be impracticable as the costs of pursuit would far exceed what any one plaintiff or class member has at stake; (b) as a result, very little litigation has been commenced over the controversies alleged in this Complaint and individual class members are unlikely to have interest in prosecuting and controlling separate individual actions; (c) the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy.

### COUNT I: VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT, 15 U.S.C. § 1692g(a)(4).

94.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 93.

95.   The FDCPA at section 1692g(a) provides:

(a) Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing —

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

**(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and**

**(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.**

15 U.S.C. § 1692g(a).

96. Defendants violated 15 U.S.C. § 1692g(a)(4) by failing in the Letter (*See* Exhibit "A") to notify Plaintiffs that in order for Plaintiffs to require Defendants to obtain verification of the alleged debt and mail such verification to Plaintiffs, Plaintiffs' dispute of the alleged debt, or portion thereof, would need to be "**in writing**", and Defendants therefore failed to meaningfully convey the required disclosure.

97.  Defendants' January 12, 2011 Letter (*see* Exhibit "A") provides:

| | |
|---|---|
| 1. | Unless you notify us within thirty days after receipt of this notice that you dispute the validity of the debt, or any portion thereof, the debt will be assumed to be valid by us. |
| 2. | If you notify us within the thirty-day period that the debt, or any portion thereof, is disputed, we will obtain verification of the debt or a copy of a judgment against you and a copy of such verification or judgment will be mailed to you by us. |
| 3. | Additionally, within the thirty-day period, we will provide you with the name and address of the original creditor, if different from the current creditor. |

98.  Defendants further failed to meaningfully convey to Plaintiffs the required disclosure in writing within five days of the Letter.

99.  Defendants' omission would reasonably lead the least sophisticated consumer to believe, erroneously, that a verbal dispute of the debt will protect her rights in obtaining verification.  See *Grief v. Wilson, Elser, Moskowitz, Edelman & Dicker, LLP*, 217 F. Supp. 2d 336, 340-41 (E.D.N.Y. 2002) ("Any consumer, not simply the least sophisticated consumer, who read this letter would not know that to secure her right to obtain verification of the debt and the identity of the original creditor, her dispute of the debt and request for the identity of the original creditor **must be in writing**.") (emphasis added); *see also Nero v. Law Office of Sam Streeter, PLLC*, 655 F. Supp. 2d 200, 206 (E.D.N.Y. 2009) (same); *Welker v. Law Office of Daniel J. Horwitz*, 699 F.Supp.2d 1164 (S.D. Cal. 2010) ("Accordingly, there can be no dispute Defendant violated the

FDCPA insofar as its dunning letter failed to advise [the plaintiff] that to be entitled to a verification of the debt under subsection (a)(4) or to obtain the name and address of the original creditor under subsection (a)(5) the **request had to be in writing**.") (emphasis added).

100. "The least sophisticated consumer could certainly interpret Defendants' letter to Plaintiff to mean that she would obtain verification of the debt or the identity of the original creditor by contacting Defendants' at the telephone number provided. Without a statement that these **requests must be in writing**, the least sophisticated consumer is not simply uncertain of her rights under the statute, she is completely unaware of them." *Grief*, 217 F. Supp. 2d 336, 340-41 (E.D. N.Y. 2002) (emphasis added). In addition, a consumer who is not informed of the writing requirements would be unable to avail herself of the protections afforded by Section 1692g(b). For example, if debt collector does not inform the consumer that a debt dispute must be in writing, the consumer could dispute the debt during a telephone call to the debt collector, but the debt collector would not be required to cease its collection efforts and the consumer would not benefit from the protections afforded by the FDCPA. *See Id.*

101. Defendants' omission would also reasonably lead consumers to

contact Defendants by telephone in order to dispute the alleged debt(s), and thereby potentially subject themselves to live, real-time collection pressure from Defendants.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint the operable complaint for class purposes;

b. Adjudging that Defendants violated 15 U.S.C. § 1692g(a)(4).

c. Awarding Plaintiffs, and all those similarly situated, statutory damages, pursuant to 15 U.S.C. §1692k, in the amount of $1,000.00 per class member.

d. Awarding Plaintiffs, and all those similarly situated, reasonable attorneys' fees ands costs incurred in this action, including counsel fees and expert fees;

e. Awarding Plaintiffs, and all those similarly situated, any pre-judgment and post-judgment interest as may be allowed under the law;

f. Awarding such other and further relief as the Court may deem

just and proper.

## COUNT II: VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT, 15 U.S.C. § 1692g(a)(5).

102. Plaintiffs repeat and re-allege each and every allegation contained in

paragraphs 1 through 93.

103. Defendants violated 15 U.S.C. § 1692g(a)(5) (*see* ¶96, above) by

failing in the Letter (*See* Exhibit "A") to notify Plaintiffs that a request for the

name and address of the original creditor would have to be made "**in writing**",

and Defendants therefore failed to meaningfully convey the required disclosure.

104. Defendants' January 12, 2011 Letter (*see* Exhibit "A") provides:

1. Unless you notify us within thirty days after receipt of this notice that you dispute the validity of the debt, or any portion thereof, the debt will be assumed to be valid by us.

2. If you notify us within the thirty-day period that the debt, or any portion thereof, is disputed, we will obtain verification of the debt or a copy of a judgment against you and a copy of such verification or judgment will be mailed to you by us.

3. Additionally, within the thirty-day period, we will provide you with the name and address of the original creditor, if different from the current creditor.

105. Defendants further failed to meaningfully convey to Plaintiffs the

required disclosure in writing within five days of the Letter.

106. Defendant's omission would reasonably lead the least sophisticated

consumer to believe, erroneously, that a verbal dispute of the debt will protect her rights in obtaining verification. See *Grief*, 217 F. Supp. 2d at 340-41 ("Any consumer, not simply the least sophisticated consumer, who read this letter would not know that to secure her right to obtain verification of the debt and the identity of the original creditor, her dispute of the debt and request for the identity of the original creditor **must be in writing**.") (emphasis added); *see also Nero*, 655 F. Supp. 2d at 206 (same); *Welker,* 699 F.Supp.2d 1164 ("Accordingly, there can be no dispute Defendant violated the FDCPA insofar as its dunning letter failed to advise [the plaintiff] that to be entitled to a verification of the debt under subsection (a)(4) or to obtain the name and address of the original creditor under subsection (a)(5) the **request had to be in writing**.") (emphasis added).

107. "The least sophisticated consumer could certainly interpret Defendants' letter to Plaintiff to mean that she would obtain verification of the debt or the identity of the original creditor by contacting Defendants' at the telephone number provided. Without a statement that these **requests must be in writing**, the least sophisticated consumer is not simply uncertain of her rights under the statute, she is completely unaware of them." *Grief*, 217 F. Supp. 2d 336, 340-41 (E.D. N.Y. 2002) (emphasis added). In addition, a consumer who is

not informed of the writing requirements would be unable to avail herself of the protections afforded by Section 1692g(b).  For example, if debt collector does not inform the consumer that a debt dispute must be in writing, the consumer could dispute the debt during a telephone call to the debt collector, but the debt collector would not be required to cease its collection efforts and the consumer would not benefit from the protections afforded by the FDCPA.  *See Id.*

108. Defendants' omission would also reasonably lead consumers to contact Defendants by telephone in order to ascertain the name and address of the original creditor, if different from the current creditor, and thereby potentially subject themselves to live, real-time collection pressure from Defendants.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint the operable complaint for class purposes;

b. Adjudging that Defendants violated 15 U.S.C. § 1692g(a)(5).

c. Awarding Plaintiffs, and all those similarly situated, statutory damages, pursuant to 15 U.S.C. §1692k, in the amount of $1,000.00 per class member.

d. Awarding Plaintiffs, and all those similarly situated, reasonable attorneys' fees ands costs incurred in this action, including counsel fees and expert fees;

e. Awarding Plaintiffs, and all those similarly situated, any pre-judgment and post-judgment interest as may be allowed under the law;

f. Awarding such other and further relief as the Court may deem just and proper.

## TRIAL BY JURY

109. Plaintiffs are entitled to and hereby demand a trial by jury on all counts.

Dated: October 5, 2011.  Respectfully submitted,

By: /s/ Dennis R. Kurz
Dennis R. Kurz
Georgia Bar No. 430489
WEISBERG & MEYERS, LLC
5025 N. Central Ave. #602

Phoenix, AZ 85012
(888) 595-9111 ext. 412
(866) 842-3303 (fax)
dkurz@attorneysforconsumers.com

*Attorneys for Plaintiffs*
RICHARD & NANCY BIGI